1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  DANNY BROWN, | )  Case No.: 1:14-cv-01812 - JLT |
| 12                Plaintiff, | )  ORDER DENYING DEFENDANT'S MOTION |
| 13        v. | )  FOR SUMMARY JUDGMENT |
| 14  AUBREY WIMBERLY, | )  (Doc. 47) |
| 15                Defendant. | ) |
| 16 | ) |

17         Aubrey Wimberly seeks summary judgment on the sole claim brought by Danny Brown, who

18  asserts Wimberly is liable for a violation of the First Amendment.  (Doc. 47)  Plaintiff opposes the

19  motion, arguing his statements were protected by the First Amendment, and that Defendant cannot

20  show the same action would have been taken if not for the protected speech.  (Doc. 49)  The Court

21  heard the oral arguments of the parties on December 14, 2016.

22         Because there are triable issues of fact as to whether the identified statements were made as a

23  result of Plaintiff's job duties, and whether Plaintiff's contract would have been terminated if not for

24  the statements, Defendant's motion for summary judgment is **DENIED**.

25  ///

26  ///

27  ///

28  ///

## I.    Factual Background[1,2]

Plaintiff was employed as Director of the Wasco Recreation and Parks District ("WRPD") beginning in September 2011.  (UMF 1-2)  Plaintiff and the WRPD entered into "an employment contract with a two-year term."  (UMF 3)  Plaintiff asserts Defendant Aubrey Wimberly served on the board of directors of the WRPD as well as "the board of directors of the Wasco Youth Little League, an organization involved in sponsoring little league baseball."  (Doc. 1 at 2, ¶ 7; *see also* UMF 5)

According to Plaintiff, "[s]hortly after [he] was hired in 2011, [he] approached Mr. Wimberly about negotiating and finalizing an agreement with the WYLL to present to the board of directors of WRPD."  (Doc. 49-1 at 2, Brown Decl. ¶ 3)  Plaintiff contends that Defendant responded it was "none of [Plaintiff's] business," and "made it clear at that time that the WYLL contract was not part of [his] job duties."  (*Id.* at 3, ¶ 3)  Plaintiff reports that during his employment, he "never negotiated any agreements with the WYLL" and was not "involved in drafting any such agreements."  (*Id.*)

Plaintiff contends Defendant permitted the WYLL "to have a 'sweetheart' agreement," and use the WRPD facilities free of charge. (Doc. 1 at 2, ¶ 7)  Plaintiff reports that on May 2, 2013, after a joint meeting between the League and the WRPD, he "spoke with Mr. Wimberly in the parking lot and told him that his association with the WYLL was a conflict of interest." (Doc. 49-1 at 4, Brown Decl. ¶ 6)  In addition, Plaintiff asserts he told Wimberly "it appeared the WYLL was receiving a sweetheart deal and that [he] had been asked about this by a third party." (*Id.*)

Plaintiff asserts that on May 16, 2013, he "attended a meeting of the WRPD board of directors,"

---

[1] The "Factual Background" is both a summary of the facts and the parties' contentions in this matter.

[2] In the Scheduling Order, parties were directed to meet and confer prior to the filing of any motion for summary judgment. (Doc. 23 at 4)  In addition, the Court ordered:
> The moving party SHALL initiate the meeting and SHALL provide a complete, proposed statement of undisputed facts at least five days before the conference. The finalized joint statement of undisputed facts SHALL include all facts that the parties agree, for purposes of the motion, may be deemed true. In addition to the requirements of Local Rule 260, the moving party shall file the joint statement of undisputed facts.

(*Id.,* emphasis omitted)  Further, the Court directed the moving party to "certify that the parties have met and conferred as ordered above, or set forth a statement of good cause for the failure to meet and confer." (*Id.*) The Court cautioned that failure to comply with this order "may result in the motion being stricken." (*Id.*, emphasis omitted)

Defendant's counsel, Mark Smith, reports that the parties met and conferred prior to the filing of the motion. (Doc. 47-2 at 2, Smith Decl. ¶ 9)  Curiously, Mr. Smith reports that though the parties "concluded… there existed no dispute as to several statements of facts," they agreed to not file a joint statement because "there were at least two proposed facts that Plaintiff disputed." (*Id.*)  Therefore, rather than file the joint statement of undisputed facts, Defendant filed only separate statement of facts (Doc. 47-1) to which Plaintiff filed a response (Doc. 50).  To the extent Plaintiff admitted any facts or the Court finds they are undisputed, the facts are identified as "UMF," for "undisputed material fact."

The Court does not condone the parties' agreement to disregard its order to prepare a joint statement, particularly where the parties evidently agreed upon many facts.  Future failure to disregard the Court's orders may result in the imposition of sanctions, including a motion being dropped from calendar.

at which he received employment evaluations from each of the board members. (Doc. 49-1 at 4, Brown Decl. ¶ 7)  After the meeting, Plaintiff "again confronted Mr. Wimberly about [the] conflict of interest," reiterated his belief that Defendant "he had a conflict of interest by sitting on the board of the directors of the WRPD and also having a relationship with the WYLL."  (*Id.*)  In addition, Plaintiff reports he informed Defendant that the "WRPD was due to have a review performed by the Grand Jury," and "the issue of the conflict of interest would be a topic of discussion."  (*Id.* at 4-5, ¶ 7)  Plaintiff contends he "intended at that time to discuss this issue of the conflict of interest and the sweetheart deal with the grand jury."  (*Id.* at 5, ¶ 7)

According to Plaintiff, Wimberly called Plaintiff the next day and told Plaintiff that "he wanted to call a special meeting of the board of directors."  (Doc. 49-1 at 5, Brown Decl. ¶ 8)  The special meeting was set for May 28, 2013.  (*Id.*; UMF 11)  WRPD board members report they did not "take[] action to renew Mr. Brown's employment contract prior to… May 28, 2013."  (Doc. 47-4 at 2, Jones Decl. ¶ 7; Doc. 47-5 at 3, Dickson Decl. ¶ 7; Doc. 47-6 at 3, McDaniel Decl. ¶ 8)  On the other hand, Plaintiff contends that "[a]t the board meeting of the WRPD held on April 19, 2013, the board voted to extend [his] contract of employment as general manager… [with] the precise terms as to the length of the extension and rate of pay would be negotiated subsequent to that meeting."  (Doc. 49-1 at 3, Brown Decl. ¶ 4)  Board member, Charles Wedel, confirms this fact.  (Doc. 49-4 at75-76) However, [o]n May 28, 2013, the WRPD' s five- member board of directors voted four-to- one to not renew [Plaintiff's] employment contract."  (UMF 12)

Plaintiff contends his discussion with Wimberly "concerning the conflict of interest of Defendant and the sweetheart agreement... as well as the potential upcoming grand jury investigation involved a matter of public concern and was protected by the 1st and 14th amendments to the United States Constitution."  (Doc. 1 at 3, ¶ 13)  He asserts these statements were "a determining factor in the termination of employment and the revocation of his two-year renewal of his employment contract."  (*Id.*, ¶ 14)  Therefore, Plaintiff asserts Wimberly is liable for a violation of his civil rights pursuant to 42 U.S.C. § 1983.  (*Id.* at 3, ¶15)

Defendant argues Plaintiff is unable to succeed upon his claim, and seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 47)

## II.  Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56(a); see also *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some

4

metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits.  *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary judgment, the Court can only consider admissible evidence.  *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## III.    Evidentiary Objections

Pursuant to Rule 56(c) of the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  *See also Block v. City of Los Angele*s, 253 F.3d 410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge).

In addition, the Federal Rules of Evidence provide that a witness may not testify unless "the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  A lay witness may testify only as to those opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R.

Evid. 701.

Defendant objects to several statements made by Plaintiff in the declaration filed in opposition to the motion for summary judgment.  (Doc. 51-1)  In addition, Defendant objects to evidence attached to the declaration of Randy Rumph, Plaintiff's counsel.  (*Id.*)

### A.       Brown Declaration, Paragraph 4

Plaintiff stated in his declaration, "At the Board meeting of the WRPD held on April 19, 2013, the Board voted to extend my contract of employment as general manager, however, it was decided that the precise terms as to the length of the extension and rate of pay would be negotiated subsequent to that meeting."  (Doc. 49-1 at 2, ¶ 4)  Defendant objects to the statement, asserting it "lacks foundation, lacks personal knowledge," is "hearsay," and violates best evidence rule.  (Doc. 51-1 at 2)  According to Defendant, "Brown's characterization of the actions or statements of the WRPD Board is inadmissible hearsay, lacks foundation and is belied by the minutes of the Board meeting."  (*Id.*)

Significantly, however, Plaintiff asserts it was his "regular practice during the time [he] worked as general manager and [ ] to attend the board meetings, prepare minutes of those board meetings, and maintain those minutes of the board of the WRPD."  (Doc. 49-1 at 2, ¶ 4)  In addition, Plaintiff reports that he attended the Board meeting on April 19, 2013 and was responsible for preparing the minutes after the meeting, which were filed as "Exhibit 3" to the declaration of Randy Rumph.  (*Id.*)  Thus, Plaintiff has personal knowledge of the events at the meeting, and the objections as to lack of foundation and personal knowledge are **OVERRULED**.

In addition, to the extent Plaintiff reports the result of the vote of the Board regarding the status of his contract, the Court construes the vote to be a statement by Wimberly, as a representative of the Board.  Because the statement is offered against Wimberly, it is not inadmissible hearsay.  *See* Fed. R. Evid. 801(d)(2)(A).  Accordingly, Defendant's hearsay objection is **OVERRULED**.

Finally, the statement does not violate the best evidence rule, which provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provide otherwise."  Fed. R. Evid. 1002.  Plaintiff has properly authenticated the minutes from the meeting on April 19, 2013, as a business record, the minutes indicate only that "the Board act[ed] to retain the District Manager with contractual details pending."  (Doc. 49-3 at 21)

Plaintiff clarifies in his declaration that the pending contractual details included "the precise terms as to the length of the extension and rate of pay." (Doc. 49-1 at 3, ¶ 4)  Thus, the minutes do not contradict the statement made by Plaintiff in his declaration.  Rather, Plaintiff produced minutes from the meeting that are consistent with his statement, and does not violate the best evidence rule.  *Compare with Medina v. Multaler, Inc.*, 547 F.Supp.2d 1099, 1114 n.57 (C.D. Cal. 2007) (finding an employee's declaration was inadmissible under the best evidence rule where she stated that her supervisor sent emails, because she did not produce the emails and her testimony was offered to prove the content of the writings in question).  Therefore, Defendant's objection is **OVERRULED**.

### B.    Brown Declaration, Paragraph 5

Defendant objects to "[t]he entirety of ¶5" (Doc. 51-5 at 2), in which Plaintiff stated:

> At some time in the Spring of 2013, I was stopped at the grocery store by a member of the board of directors of the Buttonwillow Parks and Recreation District who asked about the "sweetheart deal" the WYLL was receiving from the WRPD.  This individual told me that the Buttonwillow little league was asking the board at Buttonwillow to give it the same deal the WYLL had with the WRPD. I understood that the WYLL at that time was only paying a "per head" fee per baseball player and also was able to retain all proceeds from concessions.  I assumed that was what this individual was discussing.  I knew from my prior discussion with Mr. Wimberly that the relationship with the WYLL was not part of my job function but was the board's function.  Nevertheless, after that discussion in the grocery store, I felt that I needed to speak out as a citizen as I felt this was wrong for Mr. Wimberly to be involved with both WRPD and the WYLL.  I felt this way because I had been told by Mr. Wimberly previously that he sat on the board of the WYLL.  I spoke to my wife and my pastor about this issue as I feared having to confront my supervisor about this situation and his conflict of interest. At no time did I ever tell my wife that I was doing this because it was part of my job or because I had to do it due to my job duties.

(Doc. 49-1 at 3-4, ¶ 5)  Defendant argues that the entire paragraph "is inadmissible hearsay and lacks foundation."  (Doc. 51-1 at 2)

As an initial matter, Defendant fails to explain his assertion this paragraph lacks foundation, and the Court will not speculate as to the grounds supporting the objection, particularly where Plaintiff asserts he was present for each conversation.  Accordingly, the objection for lack of foundation is **OVERRULED**.  In addition, as explained below, Defendant fails to demonstrate that statements are hearsay, which is defined as an out of court statement offered to "prove the truth of the matter asserted." Fed. R. Evid. 801(c).

///

1                 1.       <u>Statements by unidentified Buttonwillow board member</u>

2          Plaintiff contends he had a discussion with a board member of the Buttonwillow Parks and

3   Recreation district, in which he learned the Buttonwillow little league was asking for the same deal the

4   WYLL received from the WRPD.  (Doc. 49-1 at 3, ¶ 5)  Plaintiff offers this statement "to show why

5   Plaintiff confronted Wimberly," rather than for the truth of the conversation—that the Buttonwillow

6   little league was seeking the same deal.  Accordingly, the hearsay objection to related to the

7   conversation at the grocery store with the unidentified individual is **OVERRULED**.

8                 2.       <u>Statements by Plaintiff</u>

9          Plaintiff reports that he had conversations with his wife and pastor in which he expressed his

10  belief that it "was wrong for Mr. Wimberly to be involved with both WRPD and the WYLL."  (Doc.

11  49-1 at 4, ¶ 5)  He does not identify any specific statements made to his pastor or wife, or their

12  responses.  (*See id.*)  Rather, it appears Plaintiff reports the discussions took place to show his concern

13  and "fear[]" about "having to confront [his] supervisor about this situation and his conflict of interest."

14  (*Id.*)  Because the statements go to Plaintiff's state of mind and not the truth of the matter, the hearsay

15  objection is **OVERRULED**.

16                3.       <u>Statements by Wimberly</u>

17         In paragraph 5 of his declaration, Plaintiff refers to a conversation with Wimberly, during

18  which Plaintiff learned Wimberly sat on the board of the WYLL.  (Doc. 49-1 at 4, ¶ 5)  Importantly,

19  an opposing party's statement offered against that party is not considered hearsay.  Fed. R. Evid.

20  801(d)(2)(A).  Therefore, the hearsay objection as to the statements by Wimberly is **OVERRULED**.

21  **C.    Brown Declaration, Paragraph 6**

22         Plaintiff asserts in paragraph 6 of his declaration that he "spoke with Mr. Wimberly in the

23  parking lot and told him that his association with the WYLL was a conflict of interest because he was

24  also on the board of directors of the WRPD."  (Doc. 49-1 at 4, ¶ 6)  In addition, Plaintiff asserts he told

25  the defendant that "it appeared the WYLL was receiving a sweetheart deal and that [he] had been

26  asked about this by a third party."  (*Id.*)  Defendant contends this statement is "[i]nadmissible hearsay

27  [and] lacks foundation."  (Doc. 51-1 at 3)

28         Notably, Plaintiff lays the foundation for the conversation, and it was within his personal

knowledge as to what he said to the defendant.  The statement is not offered for the truth of the matter, but instead to explain why Plaintiff took the action he did, and his state of mind when talking to Wimberly.  Accordingly, Defendant's objections are **OVERRULED**.

### D.      Brown Declaration, Paragraph 7

Defendant objects to the majority of paragraph seven in Plaintiff's declaration, in which Plaintiff stated:

> After the board meeting of the WRPD, I again confronted Mr. Wimberly about this conflict of interest in the parking lot. I again reiterated that he had a conflict of interest by sitting on the board of directors of the WRPD and also having a relationship with the WYLL (which at that time included coaching). I told him that the deal the WYLL was receiving from the WRPD "stinks." The Kern County Grand Jury routinely investigates special districts like the WRPD and investigates the operations of those districts. I understood at that time (May 16, 2013) that WRPD was due to have a review performed by the Grand Jury. I told Mr. Wimberly that the WRPD was due to be reviewed by the Kern County Grand Jury. I told him that the issue of the conflict of interest would be a topic of discussion before the Grand Jury. I intended at that time to discuss this issue of the conflict of interest and the sweetheart deal with the grand jury. Such testimony before the grand jury was not part of my job function.

(Doc. 49-1 at 4-5, ¶ 7)  According to Defendant, this statement is inadmissible because it is hearsay and lacks foundation.  (Doc. 51-1 at 2-3)

Notably, Plaintiff lays an adequate foundation for the conversation, in stating that he was present for the contact with Wimberly and what occurred during it. The objection as to foundation is **OVERRULED**.

Likewise, the hearsay objection is **OVERRULED**, because the Court declines to speculate as to which portion of the paragraph Defendant objects to as hearsay.  *See Burch v. Regents of the Univ. of Cal.,* 433 F. Supp. 2d 1110, 1124 (E.D. Cal. 2006) (explaining the Court should not be required to "identify potential hearsay, and determine if an exception applies - all without guidance from the parties" in evaluating the merits of evidentiary objections on a motion for summary judgment); *see also Cassells v. Mehta,* 2007 U.S. Dist. LEXIS 60890 at *14 (E.D. Cal. Aug. 20, 2007) ("to prevail on a hearsay objection, defendants must object to particular statements and explain the objection…[and] failure to do so is sufficient basis for overruling the objection").

### E.      Brown Declaration, Paragraph 9

Plaintiff asserted he first reviewed statements provided by employees complaining about him

to the Board after he filed the action now before the Court.  (Doc. 49-1 at 5, ¶ 9)  He asserted, "I was shocked when I reviewed the statements as they contained lies and untruthful statements about my conduct when I served as general manager of the WRPD."  (*Id.*)  Defendant objects to this statement as hearsay and lacking foundation.  (Doc. 51-1 at 3)

Significantly, there are no statements identified by Plaintiff in the portion of the declaration to which Defendant objects.  Rather, Plaintiff expresses only his reaction to reading the statements, which is within his personal knowledge.  Therefore, Defendant's objections to paragraph 9 of the declaration are **OVERRULED**.

### F.    Brown Declaration, Paragraph 10

Plaintiff asserts that he is "familiar with the fact that Seth Hokit and Mr. Wimberly are friends." (Doc. 49-1 at 5, ¶ 10) Defendant objects to this statement as lacking personal knowledge, lacking foundation, being an inadmissible opinion, and inadmissible hearsay.  (Doc. 51-1 at 3)  The Court agrees that Plaintiff fails to support this statement with any facts regarding his personal observations of the reported relationship between Mr. Hokit and the defendant.  Consequently, Defendant's objection for lack of personal knowledge is **SUSTAINED**.

### G.    Exhibit 4: Evaluation by Charles Wedel

In support of Plaintiff's opposition to summary judgment, he submitted "Employee Performance Reviews" dated May 16, 2013.  Defendant objects to the evaluation by Charles Wedel as lacking authentication and as "inadmissible hearsay."  (Doc. 51-1 at 3)

Notably, the documents in "Exhibit 4" do not indicate the name of the individual who completed each review; instead each states the reviewer is the "Board of Directors."  (*See* Doc. 49-3 at 23-26)  However, Defendant filed copies of three of four evaluations in support of the motion for summary judgment, and attached them each member of the Board of Directors.  Through a process of elimination, it appears the document to which Defendant objects is the first evaluation in Exhibit 4. (*Compare* Doc. 49-3 at 24 *with* Wimberly Decl., Doc. 47-3 at 6; Doc. 49-3 at 25 *with* Jones Decl., Doc. 47-4 at 6; Doc. 49-3 at 26 *with* Dickson Decl., Doc. 47-5 at 6; and Doc. 49-3 at 23 *with* McDaniel Decl. Doc. 47-6 at 6)

Plaintiff's counsel, Randy Rumph, asserts that each of the exhibits were "authenticated by

Danny Brown in his declaration or otherwise by deposition testimony." (Doc. 49-2 at 3, Rumph Decl. ¶ 3) Mr. Rumph acknowledges that the other evaluations were "authenticated by the other board member declarations filed with the motion." (*Id.*) Indeed, at this deposition, Mr. Wedel authenticated the document. (Doc. 49-4 at 82-83) Accordingly, Defendant's objection is **OVERRULED**.

### H.     Testimony by Charles Wedel

During the course of his deposition, Mr. Wedel testified: "That part everybody was in agreement that he did a great job. I say, 'everybody.' The five of us." (Doc. 49-4 at 83, Wedel Depo. 24:17-25:23) Defendant objects to this statement as lacking personal knowledge and foundation, and as inadmissible hearsay. (Doc. 51-1 at 3)

Notably, Mr. Wedel was asked whether he had "any other discussions with Board members regarding Danny Brown's managerial abilities in May 2013," and his response was that "everybody was in agreement." (Doc. 49-4 at 84, Depo. 24:17-22) Mr. Wedel explained "everyone verbally said he was [great]," including Wimberly. (*Id.* at 85, Depo. 25:2-6) This testimony is sufficient to lay a foundation and demonstrate personal knowledge, and these objections are **OVERRULED**.

On the other hand, Plaintiff offers the statement for the truth of the matter asserted, namely that the Board members believed he was doing a great job. Because Wimberly is a party opponent and the statement is offered against him, the hearsay objection is **OVERRULED**. Fed. R. Evid. 801(d)(2)(A). As to the statements of Board members other than Wimberly regarding Plaintiff's managerial abilities, the hearsay objection is **SUSTAINED**.

### I.     Conclusion

To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *See Burch v. Regents of the Univ. of Cal.,* 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("improper legal conclusions ... are not *facts* and likewise will not be considered on a motion for summary judgment") (citation omitted, emphasis in original). For example, Plaintiff concluded in his declaration that "testimony before the grand jury was not part of [Plaintiff's] job description." (Doc. 49-1 at 5, ¶ 7) Such conclusions are improper, and the Court's analysis relies only on evidence it has deemed admissible.

///

1    **IV.      Discussion and Analysis**

2          Plaintiff's sole claim for relief is raised under 42 U.S.C. § 1983, which is "is a method for

3    vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  In

4    relevant part, Section 1983 provides:

5          Every person who, under color of any statute, ordinance, regulation, custom, or usage,
           of any State or Territory... subjects, or causes to be subjected, any citizen of the United
6          States or other person within the jurisdiction thereof to the deprivation of any rights,
           privileges, or immunities secured by the Constitution and laws, shall be liable to the
7          party injured in an action at law, suit in equity, or other proper proceeding for redress...

8    42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a

9    constitutional right and (2) a person who committed the alleged violation acted under color of state law.

10   *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

11         A plaintiff must allege a specific injury was suffered, and show causal relationship between the

12   defendant's conduct and the injury suffered.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976).  A

13   person deprives another of a right "if he does an affirmative act, participates in another's affirmative

14   acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of

15   which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Here, Plaintiff asserts

16   Defendant violated rights arising under the Constitution of the United States by unlawfully retaliating

17   against her for engaging in conduct protected by the First Amendment.

18         "The First Amendment forbids government officials from retaliating against individuals for

19   speaking out." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  The Supreme Court

20   explained: "[P]ublic employees do not surrender all their First Amendment rights by reason of their

21   employment. Rather, the First Amendment protects a public employee's right, in certain circumstances,

22   to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417

23   (2006) (citations omitted).  The Ninth Circuit set forth the five-step inquiry to determine whether a

24   public employee's First Amendment rights were violated:

25         (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff
           spoke as a private citizen or public employee; (3) whether the plaintiff's protected
26         speech was a substantial or motivating factor in the adverse employment action; (4)
           whether the state had an adequate justification for treating the employee differently
27         from other members of the general public; and (5) whether the state would have taken
           the adverse employment action even absent the protected speech.

28

                                                    12

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

### A.      Matter of Public Concern

Whether an employee's expression may be characterized as a matter of public concern "must be determined by the content, form and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987) (citation omitted).  In general, speech concerning "individual disputes and grievances and that would be of no relevance to the public's evaluation of the performance of government agencies, is generally not of public concern."  *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 924 (9th Cir. 2004) (citation omitted).  On the other hand, "[s]peech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community."  *Eng*, 552 F.3d at 1071 (quoting *Johnson v. Multnomah Cnty., Oregon*, 48 F.3d 420, 422 (9th Cir. 1995) (internal quotations omitted))).  Although this definition is broad, "there are limits."  *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009).  The Ninth Circuit explained: "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Id.* (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995)).

Courts have held on numerous occasions that a public employee's exposure of wrongdoing by her employer—such as misuse of funds and mismanagement—is of inherent public concern.  *See, e.g.*, *Johnson*, 48 F.3d at 425 (9th Cir. 1995); *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992); *Vasquez v. City of Bell Gardens*, 938 F. Supp. 1487, 1493 (C.D. Cal. 1996).  Consequently, the alleged conflict of interest for Wimberly was a matter of public concern, and for purposes of this motion Defendant does not argue Plaintiff is unable to satisfy this factor.  (Doc. 47 at 7)

### B.      Speech as a private citizen or public employee

"Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng*, 552 F.3d at 1071 (quoting *Posey v. Lake Pend Oreille School Dist. No*. 84, 546 F.3d 1121, 1126-27 (9th Cir. 2008)).  On the other hand, "when public employees

make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.  The plaintiff bears the burden of showing that the speech was made in the capacity of private citizen and not a public employee.  *Id.*, 547 U.S. at 421-22; *Posey*, 546 F.3d at 1126-27.  Defendant argues, "Plaintiff cannot establish that he spoke as a private citizen and not within his official duties as the manager of the WRPD." (Doc. 47 at 7)  Plaintiff contends the statements he made were not pursuant to his job duties, and instead that he spoke as a private citizen. (Doc. 49 at 6-12)

The "District Manager" job description indicates that Plaintiff was required to "[o]versee and evaluate the efficiency and effectiveness of recreational programs in light of the District's goals, objective and priorities."  (Doc. 49-3 at 15)  In addition, Plaintiff's duties included preparation of "staff analysis and reports on various projects and programs," and resenting the analyses "in both oral and written form through Board and other public presentations."  (*Id.* at 16) The district manager was also required to "[c]onduct complex administrative and operational studies, analyze findings, and prepare recommendations regarding proposal[s] for programs, services, equipment, and personnel."  (*Id.*)  However, the job description also indicates the descriptions are intended to be "a guideline," and "any other tasks may be asked of [the district manager] as the need arises."  (*Id.* at 17)

Defendant contends he asked Plaintiff "to perform an analysis of costs and expenses related to WYLL games as part of his duties as the district manager."[3]  (Doc. 47-3 at 2, Wimberly Decl. ¶ 4)  In addition, WRPD board member Gary Jones asserts, "As part of his duties as district manager, Mr. Brown performed an analysis of costs and expenses related to WYLL games" in 2012, which Mr. Jones reviewed.  (Doc. 47-4 at 2, Jones Decl. ¶ 4)  Likewise, Warren McDaniel reports that he reviewed "an analysis of costs and expenses related to WYLL games" prepared by Plaintiff.  (Doc. 47-6 at 2,

---

[3] Even assuming that this analysis was a part of Brown's job duties in 2012, there is no showing that when he engaged in the protected conduct, it was still part of his duties.  (Doc. 49-3 at 2) The contract indicates that Brown was required to perform the duties "as the Board may from time to time assign" and that the Board reserved the right to change these duties.  *Id.*  In light of the fact that Wimberly does not dispute that Brown never had any role in the terms, negotiation or execution of any contract between the District and WYLL, it appears the financial analysis was a one-time duty.  On the other hand, even if this financial analysis was an ongoing duty imposed on Brown, this does not determine that when he raised the issue of conflict with Wimberly that his job duties required he do so.

14

McDaniel Decl. ¶ 4)  Mr. McDaniel also says he "had conversations with [Plaintiff] regarding costs associated with the WYLL," during which Plaintiff expressed a belief "that WRPD board chairman Aubrey Wimberly had a 'potential conflict of interest' by serving on both the WYLL and WRPD boards of directors."  (*Id.*, McDaniel Decl. ¶ 5)  Ryan Dickson does not assert he reviewed an analysis that Plaintiff prepared, but reports Plaintiff was concerned "the WYLL was not paying its fair share of expenses to use WRPD facilities."  (Doc. 47-5 at 2, Dickson Decl. ¶ 4)

On the other hand, Plaintiff asserts that shortly after he was hired, he approached Defendant "about negotiating and finalizing an agreement with the WYLL to present to the board of directors of WRPD."  (Doc. 49-1 at 2, Brown Decl. ¶ 3)  Plaintiff reports,

> Mr. Wimberly made it clear at that time that the WYLL contract was not part of my job duties as he told me at that time that he negotiated the agreements with the WYLL.  I responded to Mr. Wimberly by stating "Isn't that the job of staff?"  Mr. Wimberly replied that it was "none of my business," to "do as you are told."

(*Id.* at 3, ¶ 3)  Further, Plaintiff asserts he "never negotiated any agreements with the WYLL, nor was [he] involved in drafting any such agreements." (*Id.*)  Notably, Plaintiff does not address—and, hence, does not dispute—that he performed an analysis of the costs and expenses related to the WYLL agreement for the board of directors to review.

Nevertheless, though an analysis of the costs and expenses of the WYLL may have been part of Plaintiff's job duties, it is unclear whether evaluating potential conflicts of interest was an obligation of the district manager.  The formal job description does not indicate such a review was required by the district manager.  Moreover, the district manager operated under the "[d]irect supervision" of the WRPD Board.  (Doc. 49-3 at 15)  Thus, it is unlikely Plaintiff's job duties included monitoring his supervisors for conflicts of interest.[4]  Indeed, Plaintiff testified that his concern regarding the conflict of

---

[4] Defendants refer to the testimony of Plaintiff's wife, Kathy Brown, to support their assertion that the statements related to a conflict of interest arose from Plaintiff's job duties.  (Doc. 47 at 9-10, citing K. Brown Depo. 67:9-69:10)  Mrs. Brown testified that Plaintiff had been contacted  by  a third party who was chagrined that the WYLL was getting a deal that no one else received.  Id. at 47-2 at 39.  She reported that Brown "was concerned that the Wasco Parks and Recreation District… was going to look bad," "because it's wrong to get a deal like that."  (*Id.* at 10)  She reported that Plaintiff "felt in order to do his job properly, he had to let his boss, Aubrey Wimberly, know about this."  (*Id.*)  However, to what "this" refers is unclear.  Thus, Mrs. Brown's testimony is vague as to whether Plaintiff felt he needed to talk to his boss regarding the contact by the third party, the WRPD looking bad, or whether WYLL's deal was bad.  Regardless, the testimony fails to establish that Plaintiff's "concern" regarding the conflict was a part of his job as the district manager.  At most, the entire colloquy seems to demonstrate only that Mr. Brown had concerns and that Mrs. Brown's opinion was that for Mr. Brown to do his job properly he needed to confront Wimberly.

15

interest arose as a taxpayer in the district, rather than as an employee.  (Doc. 49 at 8)  Specifically, Plaintiff testified:

> Well, I'm a taxpayer of the district. I felt like that there may have been some – something going on. I mean, if he's involved with one – financial dealing with one organization, he has definitely monies there, and yet he's negotiating a contract with that same organization on another side, I'm looking at it from the outside looking in. That looks to me like there could be a problem.

(Doc. 49-4 at 19, D. Brown Depo. 258:8-14)  Plaintiff said he did not raise his concern regarding the conflict of interest at any board meeting "'cause it wasn't part of [his] duties as a district manager." (*Id.* at 20, D. Brown Depo. 260:13-15)  Rather, Plaintiff testified his "concerns came from being a private citizen and telling Mr. Aubrey Wimberly that 'Hey, you know, this looks -- this looks like -- this just looks bad." (*Id.*, 260:16-18)

Previously, this Court observed that a statement in opposition to the action of a supervisor "is not easily construed as a duty within the scope of … employment."  *Gardner v. Shasta County*, 2007 U.S. Dist. LEXIS 81047 at *10 (E.D. Cal. Nov. 1, 2007).  In *Gardner*, the plaintiff was employed as the program director for the Shasta County Victim/Witness Assistance Program.  *Id.* at *2.  The plaintiff protested against actions taken by her supervisor, and the defendants argued the statement protesting the supervisor's actions "was made pursuant to [the plaintiff's] official duties and not as a concerned citizen."  *Id.* at *3, 5-6.  However, the plaintiff argued "it was not one of her official job duties to monitor her supervisor for potential misconduct."  *Id.* at *9-10.  In addition, unlike in *Huppert*[5], though Brown made his statements to Wimberly, his supervisor, there is no showing that the speech "owes its existence" to his employment. *Garcetti*, 547 U.S. at 421. Likewise, Brown's job was not a "highly hierarchical employment setting such as law enforcement" where it is relevant, though not necessarily dispositive, that he spoke only to one of his supervisors. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013).  Rather, his employment setting was like most job settings that lack a militaristic structure.  Thus, when the Court takes the evidence in the light most favorable to Plaintiff, it fails to show that Brown was duty-bound to monitor the board members for conflicts of interest.

Based upon the evidence presented, the Court cannot say Plaintiff's job duties encompassed an

---

[5] *Huppert v. City of Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009) overruled by *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013)

obligation to discuss his concern about a conflict of interest with Wimberly or the grand jury. Thus, Plaintiff has met his burden of showing his speech was made as a private citizen rather than as a public employee. *See Eng*, 552 F.3d at 1071.

### C.      Substantial or motivating factor of the adverse employment action

Once a plaintiff meets the burden of showing she spoke on a matter of public concern as a private citizen, the next step is to determine "whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action." *Eng*, 552 F.3d at 1070. First, this requires the Court to determine whether an adverse employment action took place. Second, a plaintiff must prove "'retaliatory animus [w]as the cause of injury,' with causation being 'understood to be but-for causation.'" *Lacey v. Maricopa County*, 693 F.3d 896, 916-17 (9th Cir. 2012) (quoting *Hartman v. More*, 547 U.S. 250, 260 (2006)).

### 1.      Adverse action

The Ninth Circuit determined, "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir.2003). An act is adverse within the context of the First Amendment if it is "reasonably likely to deter employees from engaging in a protected activity." *Id.* at 976. Here, Plaintiff asserts that his employment contract with the WRPD was terminated as a result of the protected statements. For purposes of this motion, Defendant does not dispute that the termination qualifies an as adverse action under the First Amendment. (*See* Doc. 47 at 7)

### 2.      Causation

To demonstrate that retaliation was a substantial or motivating factor, "a plaintiff can (1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) introduce evidence that the employer expressed opposition to the speech; or (3) introduce evidence that the proffered explanations for the adverse action were false and pretextual." *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 750 (9th Cir. 2010) (citing *Coszalter*, 320 F.3d at 975) (emphasis added). Here, there is indirect evidence to support Plaintiff's claim for relief, given the timing of the vote to terminate his contract.

17

There is no "mechanically applied criterion" for the Court to determine whether a specific time period supports an inference that an adverse action was retaliatory. *Coszalter*, 320 F.3d at 977. The Ninth Circuit explained:

> Retaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation...There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation.

*Coszalter*, 320 F.3d at 978. Nevertheless, the Ninth Circuit has "held that proximity in time may support an inference of retaliation sufficient to survive summary judgment." *Anthoine,* 605 F.3d at 751 (citing *Allen v. Iranon*, 283 F.3d 1070, 1077-78 (9th Cir. 2002)).

Plaintiff's protected statements were made on May 2 and May 16, 2013. (Doc. 49-1 at 4, Brown Decl. ¶¶ 6-7) He reports that the day after Plaintiff discussed the conflict of interest with Wimberly the second time, Wimberly called Plaintiff and said "he wanted to call a special meeting of the board of directors" and decided to have the District's attorney present for it. (*Id.* at 5, Brown Decl. ¶ 8; Doc. 49-3 at 28, Doc. 49-4 at 104) The special meeting was scheduled for May 28, 2013, at which time the WRPD Board discussed Plaintiff and voted not to renew Plaintiff's contract. (UMF 11, 12) Given the close proximity in time, a jury could reasonably infer that the special meeting was called in retaliation for Plaintiff's speech. *See, e.g., Anthoine*, 605 F.3d at 751 (finding causation could be inferred where the plaintiff was disciplined within a couple weeks of his protected speech, and given notice of his termination approximately four months later); *Salem v. Terhune*, 72 Fed. App'x 670, 672 (9th Cir. 2003) (where the protected activity took place in May and retaliation occurred between August and October of the same year, the temporal proximity was sufficient to survive summary judgment).

### D.       Whether the same action would be taken

Because Plaintiff met his burden on the first three *Eng* factors, the burden shifts to Defendant to demonstrate either he "had adequate justification for treating Plaintiff differently from other members of the general public," or "would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Eng*, 552 F.3d at 1072. The Court should consider

18

1    whether the same adverse action would have been taken "if the proper reason alone had existed."

2    *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996).

3            Defendant contends, "there is more than ample evidence in the record of misconduct on the part

4    of the Plaintiff to constitute a sufficient cause for not renewing his contract." (Doc. 47 at 12)

5    Defendant observes that "board members were critical of Mr. Brown's performance as the district

6    manager and found his skills lacking in key areas," and employees provided statements to the Board

7    that included allegations of "bullying, inappropriate and sexually-charged comments made in the

8    presence of district personnel and claims of surreptitiously viewing female lifeguards in states of

9    undress." (*Id.*)  According to Defendant, "the Board would have taken the adverse employment action

10   absent the protected speech."  (*Id.*)

11           On the other hand, Plaintiff reports that in April 2013, the Board agreed to "extend [his]

12   contract of employment as general manager… [with] precise terms as to the length of the extension and

13   rate of pay" to be decided upon at a future meeting."  (Doc. 49-1 at 3, Brown Decl. ¶ 4)  Indeed,

14   minutes from the meeting indicate: "the Board act[ed] to retain the District Manager with contractual

15   details pending."  (Doc. 49-3 at 21)  Board member Charles Wedel confirmed that in April 2013,

16   Plaintiff was told that his contract with the WRPD would be renewed, but that the Board members "just

17   weren't sure about whether it would be one or two years."  (Doc. 49-4 at 75, Wedel Depo. 13:20-24)

18           Mr. Wedel testified that at the special meeting, Defendant presented employee statements[6] to

19   the other board members and said, "I want you to read these complaints." (Doc. 49-4 at 90, Wedel

20   Depo. 31:8-14)  Mr. Wedel said reviewing the documents took about twenty minutes.  (*Id.* at 91, Wedel

21   Depo. 32:21-25)  After the documents were reviewed, Mr. Wedel reports that Defendant was the first to

22   speak, and stated: "There's no way we can hire this man back being this … was written about him."

23   (*Id.* at 92, Wedel Depo. 33:1-22)  According to Wedel, Wimberly said, "There's no way we can allow

24   Danny to come back."  *Id*. Mr. Wedel reports that he questioned whether this was a "witch hunt" and

---

[6] The timing of the collection of these grievances is troubling and Wimberly fails to present evidence explaining it. On the other hand, the plaintiff asserts that regardless of the submission of the employee complaints, the operative event is Mr. Wimberly calling the special meeting so close in time to the protected speech for the purpose of terminating his employment.  Mr. Wimberly presents no evidence countering that the reason he called the meeting was not with  an unlawful motive.

whether he was being "railroaded." (*Id.* at 93, Wedel Depo. 38:11-19)  In response, Wimberly "got mad" at him.  *Id.*  Wedel urged that they needed to find out if the complaints were true and asked whether it was possible to look at Plaintiff's hard drive to determine whether at least some of the allegations were true. *Id.* When he learned that this could occur, he asked for an investigation. *Id.* However, Wimberly responded: "No, we don't need any more trouble." (*Id.*, 38:20-21)  Defendant then made the motion not to retain Plaintiff. (*Id.* at 94, Wedel Depo. 39:17-18)

Notably, Defendant fails to present any evidence that a special meeting would have been called if not for the protected statements.  Rather, the evidence presented by Plaintiff indicates that the Board intended to act to renew Plaintiff's contract with the WRPD and intended to do so at a future, regularly scheduled meeting.  (Doc. 49-3 at 20-21)  However, after Plaintiff spoke to Defendant regarding the conflict of interest, *Defendant* convened the special meeting to discuss Plaintiff's ongoing employment, *Defendant* presented the employee statements with the adverse allegations and told the others to read them, *Defendant* announced to the other board members that, "There's no way we can hire this man back," *Defendant* refused to allow investigation into the allegations, and *Defendant* made the motion not to renew Plaintiff's contract.[7]  Consequently, the Court finds there is a question of fact regarding whether Defendant would have taken the same action in seeking the special meeting, or whether the same action would have been taken by the WRPD Board, which ratified Defendant's actions[8] had the protected speech not been at issue. *See, e.g., Hammond v. County of Madera*, 859 F.2d 797, 802-803 (9th Cir. 1988) (a board approved a transfer that resulted in deprivation of constitutional rights).

///

///

///

///

///

---

[7] Gary Jones and Ryan Dickson offer no facts to support their conclusion that "Wimberly did not attempt to persuade [them] to vote to not renew Mr. Brown's contract."  Moreover, the Jones/Dickson conclusion seems remarkably at odds with the testimony of Mr. Wedel describing Mr. Wimberly's statements and conduct at the meeting.

[8] Likewise, in light of the fact that Wimberly does not explain his request for counsel to be present at the special meeting, a reasonable inference to draw is that he anticipated that at the meeting Brown's contract would not be renewed.

## V.      Conclusion

As set forth above, the evidence raises genuine issues of fact as to whether Plaintiff suffered retaliation in violation of the First Amendment.  Accordingly, Defendant's motion for summary judgment is **DENIED**.


IT IS SO ORDERED.

Dated:   **December 14, 2016**                    **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE